















CAG   2/3/05   10:51

3:04-CV-00326   LITE BREEZE INC V. SPEARS

*62*

*OPPM.*

KATHLEEN M. WALKER SBN 202185
Attorney At Law
3421 Thorn Street
San Diego, California 92104
619-255-0987 telephone
619-255-0986 facsimile

Attorney for Plaintiff

FILED

05 FEB -2 PM 4: 27

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

Caguner                      DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITE BREEZE, INC., a California corporation, | Case No.: 04 CV 0326 DMS (JFS) |
| Plaintiff, | PLAINTIFF LITE BREEZE'S MEMORANDUM OF LAW AND POINTS OF AUTHORITIES IN OPPOSTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| BRITNEY SPEARS, an individual; CLEAR | |
| CHANNEL ENTERTAINMENT TELEVISION | Judge: Hon. Dana M. Sabraw |
| | Date: February 18, 2005 |
| HOLDINGS, INC., a Delaware corporation; | Time: 2:30 p.m. |
| SIGNATURES NETWORK, INC., a California | |
| corporation; ZOMBA RECORDING CORPORATION, | |
| dba JIVE RECORDS, a New York corporation; | |
| BRITNEY BRANDS, INC., a Louisiana corporation; | |
| and BRITNEY TOURING, INC., | |
| A Louisiana corporation. | |
| Defendants. | |

ORIGINAL

MEMO OF LAW - 04-CV-0326 DMS (JFS)

# TABLE OF CONTENTS

PAGE

I.    Introduction.................................................................................................................1

II.   Facts........................................................................................................................3

    A.  Lite Breeze, Inc. And Its Registered Trademark "In The Zone".........................3

    B.  Lite Breeze's Products, Services And Clients................................................4

    C.  Lite Breeze Expands Into The Music Industry................................................5

    D.  The Symbiotic Relationship Of Sports And Music.............................................7

    E.  Defendants' Use Of The Mark "In The Zone"................................................7

        1.  The "In The Zone" Album And DVD................................................8

        2.  The "In The Zone" Concert Tour...................................................9

        3.  The "In The Zone" T-Shirt.........................................................10

III.  Argument..................................................................................................................10

    A.  Defendants' Use Of Lite Breeze's Mark Constitutes Trademark Infringement.....................10

        1.  Defendants' Use Of Lite Breeze's Mark Is Strong...................................12

        2.  The Parties' Use Of The Mark Is Identical...........................................14

        3.  The Products And Services Provided By The Parties Are Related.................15

        4.  There Is Evidence Of Actual Consumer Confusion.................................16

        5.  The Parties Use The Same Marketing Channels....................................18

        6.  The Parties Offer The Same Goods And Services...................................19

        7.  Lack Of Knowledge Of Plaintiff's Mark Does Not

            Preclude Infringement.............................................................20

        8.  The Consumer Will Believe That Ms. Spears Has Expanded

            Into The Clothing Business.........................................................20

    B.  Defendants' Use Of The Mark Does Not Constitute Fair Use...........................20

    C.  The First Amendment Does Not Preclude Liability.......................................21

1.   Artistic Relevance Is A Question Of Fact.................................................22

2.   Defendants' Use Of The Phrase "In The Zone"

   Has No Artistic Relevance.................................................................22

      (a)  Use Of "In The Zone" In The Lyrics

         To "Me Against The Music"....................................................23

      (b)  Use Of "In The Zone" As Album Title

         Has No Artistic Relevance...................................................23

      (c)  Use Of "In The Zone" As A Concert Tour

         Title Has No Artistic Relevance.............................................24

      (d)  Use Of "In The Zone" On T-Shirt

         Has No Artistic Relevance...................................................25

IV.   Conclusion.................................................................................25

1

# TABLE OF AUTHORITIES

2

3

**CASES**                                                                                   **PAGE**

Ameritech, Inc. v. American Information Technologies Corp., 811 F.2d 960 (6th Cir. 1987)............................11

AMF Inc. v. Sleekcraft Boats, 559 F.2d 341 (9th Cir. 1979)...........................................................passim

Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 408 F. Supp. 1219 (D. Colo. 1976),
aff'd and modified, 561 F.2d 1365 (10th Cir. 1977).............................................................17

Brookfield Comm., Inc. v. West Coast Ent. Corp., 174 F.3d 1036 (9th Cir. 1999).....................16, 19

Charrette Corp. v. Bowather Comm. Papers, Inc., 13 U.S.P.Q.2d 2040 (T.T.A.B. 1989)................13

Cohn v. Petsmart, 281 F.3d 837, 841 (9th Cir. 2002).......................................................12, 15

Dreamwerks Production, Inc. v. SKG Studio, 142 F.3d 1127 (9th Cir. 1998)................................. passim

Eclipse Ass'n, Ltd. v. Data General Corp., 894 F.2d 1114 (9th Cir. 1990).................................13

Fuddruckers, Inc. v. Doc's B.R. Others, Inc. 826 F.2d 837 (9th Cir. 1987).............................10, 17

GoTo.com, Inc. v. The Walt Disney Co., 202 F.3d 1199 (9th Cir. 2000)...................................19

KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., __ S.Ct. ___ 2004
WL 2804921 (Dec. 8, 2004)..................................................................................21

Lite Breeze, Inc. v. Venator Group Retail, Inc., Opposition No. 99,389
to application Serial No. 74/801,684 (July 13, 1992)....................................................4

Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894 (2002)............................................20, 22-23

Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792 (9th Cir. 2003)..........................20, 22-23

McDonald's Corp. v. McKinley, 13 U.S.P.Q.2d 1895 (T.T.A.B. 1989)..............................13-14

National Cable Television Ass'n v. American Cinema Editors, Inc., 937 F.2d 1572 (Fed. Cir. 1991)..............13

Official Airlines Guides, Inc. v. Goss, 6 F.3d 1385 (9th Cir. 1993)......................................15

Parks v. LaFace Records, 329 F.3d 437 (6th Cir. 2003)..........................................22-23, 25

Rogers v. Grimaldi, 875 F.2d 994 (2d Cir.1989)..............................................................21, 25

Scarves by Vera, Inc. v. Todo Imports, Ltd., 544 F.2d 1167 (2d Cir. 1976)..........................13-14

Seale v. Gramercy Pictures, 949 F. Supp. 331 (E.D. Pa. 1996).............................................25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**RULES**

Fed. R. Civ. P. 15(b)............................................................................................11

**OTHER AUTHORITIES**

J. Thomas McCarthy, *McCarthy On Trademarks* (4th Ed. 2004)...........................................20

Sams, *Third Party Registrations in T.T.A.B. Proceedings*, 72 Trademark Rep. 287 (1982)...............................13

## I.  INTRODUCTION

Lite Breeze, Inc. ("Lite Breeze") brought this lawsuit because it has lost the value of its trademark "In The Zone," its product identity, its corporate identity, control over its goodwill and reputation and ability to move into new markets due to the massive worldwide marketing campaign launched by Defendants' promotion of Britney Spears' record album titled "In the Zone."  The defendants are Britney Spears, her concert promotion company Clear Channel Entertainment Television Holdings, Inc. ("Clear Channel"), her merchandising company Signatures Network, Inc. ("Signatures"), her record company Zomba Recording Corporation doing business as Jive Records ("Zomba"), her clothing company Britney Brands, Inc. ("Britney Brands"), and her touring company Britney Touring, Inc. ("Britney Touring") (collectively, "the Defendants").  All Defendants, other than Ms. Spears, are corporate entities supporting Ms. Spears' multi-million dollar singing and merchandising career.  Consumers may not be familiar with the individual Defendants, but are familiar with the work they have done to promote Ms. Spears and her "In the Zone" album.

Most Americans, regardless of age, have heard of Britney Spears.  In 2003 and 2004 "Britney Spears" was the most popular query on the Internet.  Her "In the Zone" album debuted at number one in its first week of release.  She has sold over 55 million record albums.  She was named the top selling female artist of this millennium.  Her concert tour supporting her "In the Zone" album was regularly sold-out.  It was estimated that she would earn over $10 million dollars in merchandise sales for her concert tour supporting her "In the Zone" album.[1]  Because of Ms. Spears' overwhelming successes, the consuming public automatically associates "In the Zone" with Defendant Spears.

*While some trademark owners might be overjoyed with the publicity a superstar such as Ms. Spears could bring to their mark by using it on an album cover, as the name of her concert tour and on merchandising,* Lite Breeze does not want to be associated with Ms. Spears.  Along with all of the exposure comes the never-ending criticism of Ms. Spears' overt sexuality in her interviews, television specials, in the lyrics to her songs and her concert

---

[1] See Walker Dec. Exs. BB, CC, M, AA, Z, DD and O.

performances.  Reviews of the "In the Zone" album illustrate the sexual nature of the album.  Excerpts from some reviews include descriptions of the "In The Zone" album as:

> ➤   "soft-porn sex, orgasm imitations"

> ➤   "the kind of casual sex the demeans all concerned"

> ➤   "In *The Zone* offers strip-club, 1-900 sex"

> ➤   "Spears sleazy slide continues . . . with each new release she gets more irresponsible, immoral and blatantly sexual . . . Steer teens away from this *zone*."[2]

     Lite Breeze's general concerns are twofold.  First, Lite Breeze has spent years cultivating a clean-cut all-American image in connection with its products and services.  The reviews and publicity surrounding the "In The Zone" album do not convey Lite Breeze's image.  Second, Lite Breeze is concerned that all of the advertising and promotion of Ms. Spears' "In the Zone" album has saturated the market, thus overwhelming Lite Breeze's ability to use its own mark.

     Lite Breeze is asserting federal, state and common law trademark infringement and unfair competition claims against the Defendants pursuant to the "reverse confusion" trademark infringement theory.  This case is not ripe for summary judgment because there are several issues of fact, including whether there is a likelihood of confusion between Lite Breeze's use of its mark and Defendants' use of the mark and whether there is any "artistic relevance" to Ms. Spears' record album and her choice of "In the Zone" as the title of the album.

     In this motion, Defendants assert that they are not liable in any respect for the use of Lite Breeze's trademark because song and album titles are not trademarkable as a matter of law.  What Defendants ignore is the converse – simply because something is not trademarkable does not mean that it cannot infringe a trademark.  Further, Defendants argue that their uses of Lite Breeze's mark are subject to the "fair use" defense.  That may be true if Defendants can establish a classic fair use defense, but their actions clearly evidence that they were not using Lite Breeze's mark in a manner that fits within the fair use defense.  Finally, Defendants argue that their use of Lite

---

[2] See Walker Dec. Exs. X, EE and GG.

1   Breeze's mark has not caused confusion in the marketplace.  As demonstrated through the relevant legal test, that is

2   simply not true.  Defendants' use of Lite Breeze's mark has, and will continue to, cause confusion in the

3   marketplace.  Because of Defendants' massive marketing campaign in support of the "In the Zone" album,

4   consumers will wrongly believe that Lite Breeze is associated with Ms. Spears and that its products and services are

5   related to Ms. Spears.

6        Below, Lite Breeze demonstrates that its trademark has been infringed pursuant to the reverse confusion

7   infringement theory, that the First Amendment is not a safe harbor for Defendants, and that Defendants' use of Lite

8   Breeze's mark does not constitute a fair use.  Overall, summary judgment is not appropriate in this case because

9   there are genuine issues of fact and Defendants are not entitled to judgment as a matter of law.

10  **II. FACTS**

11

12       **A.  Lite Breeze, Inc. And Its Registered Trademark "In The Zone"**

13       Lite Breeze, Inc. has been a registered California corporation since 1989.  Since its inception Lite Breeze

14  has been a developer, supplier and distributor of musical, sporting and special event merchandise.  It has provided

15  promotional services to thousands of events nationwide.  Lite Breeze also designs and distributes wholesale and

16  retail athletic uniforms, t-shirts, and promotional items.  Lite Breeze outsources its decorating needs (i.e., screening

17  and embroidery) and focused its efforts on sales, promotion, consulting and event services, including fundraising

18  within the sports and music industry with special emphasis on benefiting charities and youth organizations.  Garner

    Dec. ¶ 2.[3]

19       In 1992, Lite Breeze began using the phrase "in the zone" as a trademark in connection with its products

20  and services. The phrase was used on a retail clothing line, event merchandising, athletic uniforms and t-shirts, and

21  specialty items.  Additionally, Lite Breeze has engaged in print and radio advertising campaigns for its "in the zone"

22  brand.  Lite Breeze has used its mark on concert tickets, a compact disc, promotional posters, flyers, banners and

23  marquees.  Garner Dec. ¶ 3. Lite Breeze has spent years developing a clean-cut, all-American image associated with

24

25  [3] References herein to "Garner Dec." are to the Declaration of Rodd Garner In Opposition to Defendants' Motion for
    Summary Judgment, submitted concurrently herewith.

1   its In the Zone mark.  Because "In the Zone" products ultimately end up in the possession of children and young

2   adults, it is critically important to Lite Breeze that its mark is free from sexually explicit content and profanity.  Lite

3   Breeze has never knowingly participated in any event that contains adult content and purposefully gears its public

4   image toward traditional family content. Garner Dec. ¶ 4.

5          On May 11, 1993, Lite Breeze filed an application for a federal trademark for "In the Zone" with the

6   United States Patent and Trademark Office ("PTO").  Def. Facts ¶ 13.[4]  Lite Breeze spent years before the

7   Trademark Trial and Appeal Board ("TTAB") litigating the priority of its use of the mark.[5]  On October 2, 2001,

8   eight years after its initial application, the PTO registered "In the Zone" to Lite Breeze as a federal trademark for use

9   on sportswear, namely shorts, t-shirts and sweatshirts.  During the eight-year period that Lite Breeze was litigating

10  the priority of its use, it continued to use its mark in commerce.

11  **B.   Lite Breeze's Products, Services And Clients**

12          Lite Breeze supplies wholesale promotional t-shirts, sweats, cheerleading gear, marching band uniforms,

13  and sporting uniforms for teams, organizations, events, clubs, leagues, charities, coaches and schools throughout the

14  country.  Among its products, is its "In The Zone" brand. Garner Dec. ¶ 4.  Based upon its clients' needs, Lite

15  Breeze can decorate any product in its inventory with the mark "In The Zone."  Lite Breeze estimates that since the

16  inception of the brand, it has sold over one million products bearing the mark "In The Zone" throughout the United

17  States.  Garner Dec. ¶ 4.[6]

18

19

20  ───────────────

21  [4] References herein to "Def. Facts" are to Separate Statement Of Material Facts In Support of Defendants' Motion for Summary Judgment or Partial Summary Judgment, dated Nov. 23, 2004.

22  [5]  In that action, the TTAB found that Venator's use of mark "THE ZONE" was likely to cause confusion in light of Lite Breeze's mark IN THE ZONE and that Lite Breeze's use of the mark in commerce predated the Venator's use

23  of the mark.  Lite Breeze, Inc. v. Venator Group Retail, Inc., Opposition No. 99,389 to application Serial No. 74/801,684 filed on July 13, 1992, attached by the Walker Dec. Ex. P.

24  [6]  Additionally, Lite Breeze sold "In The Zone" products in Europe for four years in the early 1990's in connection with a license agreement with the Italian based SEB Sports.  During the duration of that license, Lite Breeze

25  estimates that it sold a significant number of products bearing the mark "In The Zone" throughout fourteen European countries.  Garner Dec. ¶ 5.

Lite Breeze is primarily a wholesaler, its target customers are event organizers, school districts, charities, and sporting teams and leagues. Lite Breeze's clients in turn sell the "In The Zone" brand primarily to children and young adults ages 8 to 25. Garner Dec. ¶ 4. These school children and young adults are involved in extra curricular activities such as sports, band and cheerleading. Additionally, Lite Breeze sells products, including the "In The Zone" brand, to athletic and music minded individuals primarily through its special event merchandising to schools, charities, sports, bands and fundraising efforts. Garner Dec. ¶ 4. In sum, the "In The Zone" brand ultimately ends up in the hands of fans, participants and spectators alike.

Defendants attempt to minimize Lite Breeze's use of its mark to "$3 custom t-shirts." Memo at 3-4.[7] What Defendants fail to grasp is that the "$3 custom t-shirts" represents Lite Breeze's wholesale price to its clients, who in turn mark the product up four to seven times and then resell the t-shirts to their customers at a cost of $12.00 to $21.00.[8] Garner Dec. ¶ 6. The promotional program was established to assist under-funded athletic and musical events that benefit charity and youth organizations. By making available its "In the Zone" brand at wholesale prices, Lite Breeze's clients are able to use its products to raise money for their organizations and events. Lite Breeze specifically designed this program to eliminate the middlemen in the industry who were reducing the margins and ultimately reducing the funds that go directly to the event, team or charity. Garner Dec. ¶ 6.

## C. Lite Breeze Expands Into The Music Industry

Recognizing and identifying the strong connection between sports and music, in 1994 Lite Breeze increased its commitment to the music business by purchasing a multi-purpose venue near Chicago, Illinois. Garner Dec. ¶ 7. The venue was named "The Zone" and was used as a concert hall, athletic center, restaurant, deli, and sports bar.[9] Throughout the two-year period that Lite Breeze owned and operated "The Zone," it held musical concerts at the venue, featuring local musicians as well as nationally recognized bands such as Kansas and The

---

[7] References herein to "Memo" are to Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment or Partial Summary Judgment, dated Nov. 23, 2004.

[8] This is generally the same retail price range that Defendant Signatures sold its "In the Zone" t-shirt to consumers. Def. Facts ¶ 81.

[9] Defendants' description of The Zone as "an athletic center [that] sometimes bands played music in the gym at night" is misleading and dismissive. Memo at 5. There are sports arenas throughout the country, including venues owned by Defendant Clear Channel, that house both sporting and music events. Walker Dec. Ex. QQ.

1  Edgar Winter Band. Garner Dec. Ex. A. Upon the death of the The Zone's manager, Lite Breeze put the venue up

2  for sale due to the difficulty in managing the venue and its concerts from California.[10] Garner Dec. ¶ 7.

3        Although Lite Breeze sold its concert venue in 1996, it did not exit the music business. Contrary to

4  Defendants assertion that Lite Breeze abandoned its use of its mark in 1999 (see memo at 5 n.7), Lite Breeze has

5  continued to sponsor or co-sponsor live musical events in the Southern California region. From 1998 through 2000,

6  Lite Breeze co-sponsored the San Diego Symphony. In 1999 and 2000 Lite Breeze was a co-sponsor of the

7  Callaway Winery and Wilson Creek Jazz Festivals in Temecula, California. Garner Dec. ¶ 9. Additionally, since

8  1997, Lite Breeze has sponsored the Holiday Bowl Parade and numerous 5K and 10K marathons, triathlons and

9  cycling events, all featuring live music.[11] As a sponsor or co-sponsor of these events, Lite Breeze provides

10  merchandising and promotional support through the production and sale of merchandise, selling concert tickets,

11  distributing advertising for the concerts, outfitting concert staff members in "In the Zone" t-shirts and on occasion,

12  operating a sales booth at the events to sell t-shirts and other promotional items at the retail level for event

13  organizers. Garner Dec. ¶ 9.

14        Although Lite Breeze's initial trademark did not incorporate all actual uses of the mark "In the Zone," Lite

15  Breeze has been using that mark in commerce in connection with musical events since at least 1994. Garner Dec. ¶

16  7. On January 15, 2004, before filing this action, Lite Breeze filed a trademark application with the PTO seeking to

17  expand its category of use of the mark "In the Zone" to include entertainment services in the nature of live

18  performances by musical artists. Anderson Dec. ¶ 16 and Ex. 12.[12]

19

20

21  [10] Unfortunately, most of the documents relating to Lite Breeze's operation of "The Zone" have been discarded, lost
     or destroyed over the years. In Lite Breeze's search for documents for this action, it discovered that many of its

22  documents were destroyed while in storage. The cause of the damage appeared to have been water and smoke
     damage as the storage facility was in the 2003 San Diego fire area. Garner Dec. Ex. 8. Lite Breeze has salvaged all

23  documents that it could and explained the destruction of documents to Defendants' counsel. Walker Dec. ¶ 3.

     [11] The dates indicated above are based upon Mr. Garner's recollection and a reconstruction of events through Lite

24  Breeze's checkbook registers. The documents relating to these events were destroyed by water and smoke during
     the 2003 fires. Garner Dec. ¶ 9. Defendants were supplied with copies of the checkbook registers during discovery.

25  [12] References herein to "Anderson Dec." are to the Declaration of Peter J. Anderson in Support of Defendants'
     Motion for Summary Judgment or Partial Summary Judgment, dated Nov. 23, 2004.

D.  **The Symbiotic Relationship Of Sports And Music**

Anyone who has ever attended a high school, college or professional football game knows that at half time they can expect a live musical performance.  Traditionally, the local band performed.  Now, musical superstars provide the half-time entertainment.  Since at least 1982, when Diana Ross performed at Superbowl XVI, superstars have been performing at this athletic event.  Walker Dec. Ex. B.[13]  During half time at Superbowl XXXV in 2001, Defendant Spears made a special appearance performing with Areosmith and *NSYNC.  Walker Dec. Ex. C.[14]

The relationship between sports and music is not limited to football games.  Marathons throughout the country incorporate music with their events.  Not only is music played at the events, the marathons are incorporating music into event titles.  For example, there is the Rock 'N' Roll Marathon, the Country Music Marathon and the Reggae Marathon.  Walker Dec. Exs E-G.  Most recently, Nike, the world's leading marketer and distributor of athletic apparel, launched its annual "Run Hit Wonder Tour," which features a 5K/10K race with bands stationed along the racecourse and uses the marathon promotional t-shirt as the ticket to the post race concert.  Walker Dec. Ex. J.  The sports network ESPN hosts its own sports and music award show.[15]  In 2002, Defendant Spears signed an exclusive contract with NASCAR after acting as the Grand Marshall at a NASCAR event.  Walker Dec. Ex. D.  Generally, the consuming public has come to associate sporting events with musical performances, and, specifically, it has come to associate Defendant Spears with sporting events.

E.  **Defendants' Use Of The Mark "In the Zone"**

In late 2003, Defendant Spears began to promote her album titled "In the Zone."  To promote the album, Ms. Spears gave numerous interviews, participated in television specials, appeared at radio station,, occasionally performed lived, and arranged a worldwide concert tour.  All of these events, occurring between November 2003 and January 2004, were billed as "In the Zone" events.  For example, in November 2003, Defendant Spears

---

[13] References herein to "Walker Dec." are to the Declaration of Kathleen M. Walker In Opposition To Defendants' Motion for Summary Judgment, submitted concurrently herewith.

[14] In addition to performing, Defendant Spears was seen throughout the Superbowl in Pepsi commercials.  At Superbowl XXXV, Pepsi began its new Britney Spears marketing campaign and then auctioned off Defendant Spears' outfits on the Internet.  Walker Dec. Ex. H.

[15] The "ESPN Action Sports & Music Awards" celebrate the evolution of sports and music because "[h]istorically, action sports and music have gone hand in hand . . . ."  Walker Dec. Ex. I.

participated in two one-hour television specials to promote her new album.  The first was aired on MTV and titled

"Britney: In the Zone & Out All Night," and the second was aired on ABC and titled "Britney Spears—In the

Zone."  Walker Dec. Exs. K and L.

       1.   The "In The Zone" Album And DVD

The "In The Zone" album was released in November 2003 by Defendant Zomba and debuted at number

one on the billboard charts.  Walker Dec. Ex. M.  As of one year ago, the "In the Zone" album sold over 1.6 million

copies.  Walker Dec. Ex. M.  Subsequently, in April 2004, Defendant Zomba released the "In the Zone" DVD

featuring live performances, interviews and videos from the "In the Zone" album.  Walker Dec. Ex. N.

Initially, the album was to be titled "Get In The Zone;"[16] however, Defendant Spears agreed to change the

title of her album from "Get In the Zone" to "In the Zone" because "someone had objected to 'Get in the Zone' . . .

and they did not object to 'In the Zone' being in the title."  Spears Dec. ¶ 8.[17]  That "someone" was Autozone Parts,

Inc.[18]  Def. Facts ¶ 48 and Sassoon Dec. ¶¶ 4-10 and Ex. 24.[19]  In the brief e-mail exchange between Mr. Sassoon,

an attorney and Vice President of Business Affairs of Defendant Zomba, and Mr. Donald R. Rawlins, general

counsel of Autozone, relating to the use of "get in the zone," Mr. Sassoon stated that "we did not (and do not)

believe that using the title "Get in the Zone" for a music record would infringe in any way upon your clients' alleged

trademark to the phrase."  Sassoon Dec. Ex. 24.  Despite that belief, Defendant Spears agreed to change the title of

the album to "In The Zone."

Defendants are selling the album and its related promotional merchandise to children and young adults

between the ages of 8 and 24.  Dell Furano, CEO of Defendant Signatures, stated that "Spears demo[graphics] in

1999, and the average demo[graphics] for pop stars, is ages 8-14 . . . Spears' average audience for the current tour is

---

[16] Lite Breeze would have objected to the title "Get In The Zone" based upon the TTAB's finding that "In the Zone" and "Get In The Zone" are confusingly similar.  Walker Dec. Ex. P at 4.

[17] References herein to "Spears Dec." are to the Declaration of Britney Spears In Support of Defendants' Motion for Summary Judgment or Partial Summary Judgment, dated Nov. 22, 2004.

[18] "Get In The Zone" is a federally registered trademark of Autozone Parts, Inc., registration number 2527429, Jan. 8, 2004.  Def. Facts ¶ 7(f).

[19] References herein to "Sassoon Dec." are to the Declaration of Daniel Sassoon In Support of Defendants' Motion for Summary Judgment or Partial Summary Judgment, dated Nov. 19, 2004.

1  16-24 . . . ."  Walker Dec. Ex. O.  This is the same demographic group that purchases Lite Breeze's In The Zone

2  products. Garner Dec. ¶ 4.

3
                    2.   The "In The Zone" Concert Tour

4
        After the release of the album in November 2003, Defendants continued promoting the album through a

5  worldwide concert tour.  In December 2003, Defendant Clear Channel Entertainment issued a press release

6  announcing the concert tour as "Britney Spears In The Zone Tour 2004." Ginoza Dec. ¶ 5 and Ex. 29.[20]  The press

7  release announced the "In the Zone Tour" would include 25 cities in North America.[21]  Ginoza Dec. ¶ 5 and Ex. 29.

8  To support the tour, radio and television commercials were prepared and broadcast. Ginoza Dec. ¶ 7.  Those

9  commercials referred to the tour as the "In The Zone Tour 2004." Ginoza Dec. ¶ 7.  During the time period that the

10  "in the zone" commercials ran, tickets for the concert tour went on sale. Ginoza Dec. ¶ 6.

11        Defendants claim that on January 7, 2004, the name of the concert tour was changed from "In the Zone

12  Tour 2004" to the "Onyx Hotel Tour 2004." Ginoza Dec. ¶ 9.  However, despite that change, the concert was billed

13  as and sold as the "In the Zone Tour 2004" on concert tickets and through local venues.  Between March 2, 2004

14  and April 8, 2004, Defendant Clear Channel admits that "some" concert tickets read "In the Zone Tour 2004" in 15

15  different cities. This was *after the tour name had been changed.*  Walker Dec. Ex. S at 5-6.  During the period that

16  the tickets were sold reading "In The Zone Tour 2004" an estimated total of 189,493 tickets were sold.  Walker Dec.

17  Ex. DD.  Defendants have not indicated how many tickets were actually printed as "In the Zone Tour 2004."

18  However it is noteworthy that Defendants have failed to produce even one concert ticket during that time period

19  bearing the phrase "Onyx Hotel Tour 2004."  The "Onyx Hotel Tour 2004" ticket attached as an exhibit by

20  Defendant Clear Channel references a concert that never occurred due to Ms. Spears' injury. Ginoza Dec. Ex. 42.

21        Lite Breeze's concern about the "In the Zone" tickets is threefold.  First, regardless of the formal name of

22  the tour, the tickets reading "In the Zone" will be a constant link in the consumer's mind to the connection between

23  "In the Zone" and Defendant Spears.  Second, once Defendant Clear Channel announced the concert as the "In The

24  [20] References herein to "Ginoza Dec." are to the Declaration of Tommy Ginoza In Support of Defendants' Motion for Summary Judgment or Partial Summary Judgment, dated Nov. 19, 2004.

25  [21] Subsequently, a European and another North American leg of the tour was announced.  However, after injuring her knee in June 2004, Ms. Spears cancelled all remaining concerts.  Walker Dec. Ex. Q.

Zone Tour 2004" ticket sellers and venues began their own marketing campaigns to sell concert tickets. Taking their cue from Defendant Clear Channel, they began advertising the "In The Zone Tour 2004." Walker Dec. Exs. KK, LL, MM, NN, OO and PP. Even when Defendants changed the tour name, the local venues simply incorporated both tour names into advertisements. Walker Dec. Ex. PP. Once Defendant Clear Channel let the "In the Zone Tour 2004" genie out of the bottle, it could not be put back in. Third, concert ticket stubs are collectors' items. Concert goers "keep their ticket stubs . . . [which] are sometimes kept on mirrors, in wallets, drawers, envelopes, and scrapbooks." Walker Dec. Ex. HH. In short, tickets are merchandise, not disposable items leaving no lasting residue and there may be as many as 187,493 ticket stub souvenirs of the concerts billed as "In The Zone Tour 2004." Which, in this case, is a source of permanent confusion between the Defendants and Lite Breeze.

### 3.   The "In The Zone" T-Shirt And Other Promotional Merchandising

Defendants admit that a t-shirt was produced by Defendant Signatures, pursuant to a license agreement with Defendant Britney Brands, which included the phrase "in the zone." Def. Facts ¶¶ 75 and 80. Defendants have failed to admit that any other "in the zone" promotional items were produced or sold. However, Lite Breeze has found other instances of Defendants using the phrase "in the zone" on merchandise and in promotional events in support of the album. For example, Defendant Clear Channel sponsored an "In The Zone Dance Competition" in support of the "In the Zone Tour" in the nine county San Francisco Bay area in February 2004 – a month *after* the tour name was supposedly changed to the Onyx Hotel Tour.   Walker Dec. Ex. II. Additionally, Defendant Zomba produced a two-sided poster that contains the phrase "in the zone" eight times and does not reference the Onyx Hotel Tour at all. Walker Dec. Ex. JJ.

## III.  ARGUMENT

### A.  Defendants' Use Of Lite Breeze's Mark Constitutes Trademark Infringement

The Ninth Circuit has made clear that "likelihood of confusion" is the test for trademark infringement. Fuddruckers, Inc. v. Doc's B.R. Others, Inc. 826 F.2d 837, 845 (9th Cir. 1987). The test for "likelihood of confusion" is "whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." Dreamwerks Production, Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998). To that end, in AMF Inc. v. Sleekcraft Boats, 559 F.2d 341 (9th Cir. 1979), the Ninth Circuit

outlined eight factors it uses as a guide in determining whether there is a likelihood of confusion.[22] "In the usual infringement case, these factors are applied to determine whether the junior user is palming off its products as those of the senior use." Dreamwerks, 142 F.3d at 1129-30.

However, this is not the "usual infringement case." This is a "reverse infringement case."[23] In a reverse confusion case, the advertising and promotion of the junior user (Defendants) saturates or "swamps" the market, thus "overwhelming the senior user" (Lite Breeze). "The result is that the senior user losses the value of the trademark, its product identity, corporate identity, control over its goodwill and reputation and ability to move into new markets." Ameritech, Inc. v. American Information Technologies Corp., 811 F.2d 960, 964 (6th Cir. 1987).

The seminal case in this jurisdiction relating to the application of reverse trademark confusion in the context of summary judgment is Dreamwerks. In that case, plaintiff Dreamwerks, was a small Florida company that began organizing Star Trek conventions in the Northeast and Midwest in 1984. In 1992, Dreamwerks registered its mark with the PTO. Two years later, Steven Spielberg, Jeffrey Katzenberg and David Geffen established Dream Works SKG, a company that includes a film studio and has ventures in computer gaming, video games and the toy industry. Dreamwerks, 142 F.3d at 1128-29. On motion for summary judgment, the district court held Dreamwerks did not prove a likelihood of confusion because the "core functions of the two businesses are so distinct." Id. at 1129. On appeal, the Ninth Circuit reversed the grant of summary judgment based on a finding of likelihood of confusion applying the theory of reverse confusion. Id. at 1132.

In a reverse confusion case, "there is no question of palming off, since neither the junior nor senior user wishes to siphon off the other's goodwill. The question in such cases is whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user." Id. at 1130. The Ninth Circuit has stated that in a reverse confusion case, only three of the Sleekcraft factors are pivotal: (1) strength of the mark; (2) similarity of sight, sound and meaning; and (3) relatedness of the goods. Id. As demonstrated below, the three

---

[22] "In determining whether confusion between related goods is likely, the following factors are relevant: 1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines." Sleekcraft, 599 F.2d at 348-49.

[23] Defendants claim that Lite Breeze is "switching horses" by asserting the reverse confusion theory. Since at least July 2004, when Lite Breeze submitted its ENE statement, Defendants knew of Lite Breeze's theory of infringement. Walker Dec. ¶ 2. To the extent that "issues not raised by pleading are tried by express or implied consent. . . they are treated in all respects as if they had been raised in the pleadings. Fed. R. Civ. P. 15(b). Defendants' behavior relating to Lite Breeze's theory of infringement throughout the ENE conference before Judge Stivens and in written submissions, including their summary judgment papers, amounts to consent.

1    "pivotal factors" necessary for a reverse confusion case demonstrate that there is a likelihood of confusion between

2    Defendants and Lite Breeze, thus negating summary judgment.

3             1.   Defendants' Use Of Lite Breeze's Mark Is Strong

4         Because the junior user in a reverse confusion case is not trying to palm off the senior user's mark, the

5    traditional standard in a forward confusion case relating to the strength of the mark is not applied.  Instead, the court

6    looks to the strength of the junior user's use of the mark to gauge the junior user's ability to overpower the senior

7    user's mark in the marketplace.  Dreamwerks, 142 F.3d  at 1130 n.5.  Accordingly, "in a reverse confusion claim, a

8    plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is

9    particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark."  Cohn v.

10   Petsmart, 281 F.3d 837, 841 (9th Cir. 2002) (internal citations omitted).  Here, there is no question that Defendants'

11   use of the mark is far stronger than Lite Breeze's use of the mark.

12        In anticipation of Lite Breeze's reverse confusion argument, Defendants claim that its use of "in the zone"

13   does not constitute a mark; however, it if does, then Defendants claim that it is a "weak mark."  Memo at 21.  To

14   support its argument, Defendants list numerous other uses of the phrase "in the zone."  Memo at 17-18, 21.  This

15   argument fails.

16        In their vast search for other uses of "in the zone," Defendants were unable to find one registered trademark

17   or any use of the phrase that predates Lite Breeze's use and registration of the mark.[24]  Def. Facts ¶¶ 5-7.  Although

18   Lite Breeze cannot say with one hundred percent accuracy that it was the first to use the phrase "in the zone,"

19   neither Defendants nor Lite Breeze has found any uses of the phrase – for any product – before Lite Breeze's use of

20   the phrase.[25]  Garner Dec. ¶ 10.

21

22

23   _____

24   [24] Lite Breeze began using the mark in commerce in 1992 and filed its first trademark application in 1993.  Def.
     Facts ¶ 6(a).  The next recorded use of the mark was three years later by Konami Corp. for computer and video
25   games registered in 1997.  Def. Facts ¶ 6(b).

     [25] Personally, Mr. Garner, Lite Breeze's president began using the phrase "in the zone" when he was eight years old
     in 1969 in connection with baseball.  Garner Dec. ¶ 10.

Further, as to the other uses of the phrase, the Ninth Circuit has held that "[e]vidence of other unrelated

potential infringers is irrelevant to claims of trademark infringement and unfair competition under federal law . . . ."

Eclipse Ass'n, Ltd. v. Data General Corp., 894 F.2d 1114, 1119 (9th Cir. 1990). See also Charrette Corp. v.

Bowather Comm. Papers, Inc., 13 U.S.P.Q.2d 2040 (T.T.A.B. 1989) (evidence of third party use on unrelated goods

is irrelevant); National Cable Television Ass'n v. American Cinema Editors, Inc., 937 F.2d 1572 (Fed. Cir. 1991)

(same).[26] Accordingly, no significance should be attributed to Defendants' list of third party users.

Similarly, Defendants' list of third party registrations is not evidence of actual uses by the third parties.

The Second Circuit summarized the reasoning for giving a list of third party registrations no weight:

> The significance of third-party [registration of] trademarks depends wholly upon their usage. Defendant
> introduced no evidence that these trademarks were actually used by third parties, that they were well-
> promoted or that they were recognized by consumers . . . the existence of these registrations is not evidence
> of what happens in the market place or that consumers are familiar with their use.

Scarves by Vera, Inc. v. Todo Imports, Ltd., 544 F.2d 1167, 1174 (2d Cir. 1976) (internal cites omitted); see also

Sams, Third Party Registrations in T.T.A.B. Proceedings, 72 Trademark Rep. 287 (1982) ("third party registrations

are of extremely limited evidentiary value").

As to the use of the phrase as song and album titles, all of the uses cited by Defendants occurred during the

period in which Lite Breeze was embroiled in litigation against the Venator Group and it was uncertain at that time

whether Lite Breeze would be successful in its attempt to protect its mark. Garner Dec. ¶ 11. "It is entirely

reasonable for the [trademark owner] to object to the use of certain marks in use on some goods which it believe

would conflict with the use of its marks . . . while not objecting to use of similar mark on other goods which it does

not believe would conflict with its own use." McDonald's Corp. v. McKinley, 13 U.S.P.Q.2d 1895, 1899-1900

(T.T.A.B. 1989). Moreover, the president of Lite Breeze had never heard of the other uses as album or song titles,

or even the artists, until this litigation. Garner Dec. ¶ 12. This can be attributed to the fact that of all the albums

cited by Defendants, none of them were released by a pop superstar such as Ms. Spears and the purchasers of those

---

[26] Lite Breeze cannot and does not attempt to monopolize the field with its mark. It cannot in good faith, based upon
its registered uses of the mark and its common law uses of mark, oppose the use of the mark for retail convenience
stores, automobile dealerships, the generation of electricity, financial planning or electrical data products and
services because it does not operate in those fields and has no intention to expand into those markets. Garner Dec.
¶¶ 6-7.

albums are not in Lite Breeze's demographics for its "In the Zone" brand.[27]  Additionally, there is no evidence that any of these albums were the subject of a massive marketing campaign, a worldwide concert tour or produced any merchandising whatsoever, as the Defendants did in this case.  Again, as with the list third party registrations, little, if any evidentiary value should be attributed to these uses because Defendants have failed to provide any supporting evidence as to what happened in the market place or that consumers are even familiar with their use.  Scarves by Vera, Inc., 544 F.2d at 1174.

Lite Breeze has not asserted that its mark has acquired a secondary meaning or that it is the strongest of marks.  However, all federally registered marks deserve protection.  Sleekcraft, 599 F.2d at 349.  In this case, the evidence shows that all Defendants engaged in a massive, worldwide marketing effort to sell the album, the concert tour and related merchandise.  Supra at 7-10.  Defendants have been "swamping" market with their use of the mark.  This is precisely the harm sought to be remedied by the reverse confusion theory.  Lite Breeze believes that the goodwill, which it has built up since it first used the mark in commerce in 1992, has been, and will continue to be, "washed away" by the rising tide of publicity associated with Defendants' junior mark.  Dreamwerks, 142 F.3d at 1129.

2.   The Parties' Use Of The Mark Is Identical

"Similarity of the marks is tested on three levels: sight, sound, and meaning . . . ."  Sleekcraft, 599 F.2d at 351.  Here, all three levels are virtually identical.  Both Plaintiff and Defendants use the exact same spelling and thus, have the exact same sound – "In the Zone."  As to meaning, Lite Breeze's president defines "in the zone" as "a higher level of performance that is almost subconscious, that happens at a moment in time when body, mind and soul become one."  Anderson Dec. at 2-3, ¶ 6.  Defendant Spears defines "in the zone" as "a special frame of mind where I feel that it is just me and the music, and everyone else disappears."  Spears Dec. ¶ 7.

Although all three levels of similarity are met here, Defendants assert that the marks are not similar because "on the Album and fan t-shirt the words 'in the zone' are superimposed over Ms. Spears' photograph and below her

---

[27] Of the 10 titles cited by Defendants, five of the titles were in the jazz genre and the remaining five were in the Latin, reggae, country, rock and children's genres. Anderson Dec. Ex. 53. The one exception to the demographics is the Chalk Zone, which featured children's songs from the Nickelodeon television show. Def. Facts ¶ 5(b)(4).  Even if Lite Breeze had been aware of this use, it would not have objected because it "does not believe [that it] would conflict with its own use."  McDonald's Corp., 13 U.S.P.Q.2d at 1899-1900.

1   name." Memo at 22. Obviously, Defendants concentrate on the differences. The Court should concentrate on the

2   similarities: "Although similarity is measured by the marks as entities, similarities weigh more heavily than

3   differences." Sleekcraft, 599 F.2d at 351. Defendants' reliance on Cohn v. Petsmart, 281 F.3d 837 (9th Cir. 2002) is

4   misplaced. Memo at 22-23. In Cohn the court stated "the likelihood of confusion [is] mitigated where 'the name of

5   the company invariably accompanied the trademarked slogan.'" Cohn, 281 F.3d at 842 (internal citations omitted).

6   Here, Lite Breeze has never used its company name on any of the promotional items it has produced. Moreover,

7   "Britney Spears" may have terrific name recognition, but she is not a company name. Further, unlike Cohn, Lite

8   Breeze's mark "in the zone" is not "merely a tagline," it is a brand that is sold without any reference to Lite Breeze.

9   Id. There is no question that the consuming public has come to identify "in the zone" with Defendant Spears, the

10  "issue is whether the junior mark [Defendants] is so strong as to overtake the senior mark [Plaintiff]." Id. at 841.

11  Given the identical use of the mark by the parties, this confusion factor weighs in favor of Lite Breeze.

### 3.   The Products And Services Provided By Both Parties Are Related

12  "Related goods are more likely than non-related goods to confuse the public as to the producers of the

13  goods." Official Airlines Guides, Inc. v. Goss, 6 F.3d 1385, 1392 (9th Cir. 1993). Therefore, a "diminished standard

14  of similarity" is applied when comparing the marks of closely related goods. Id. Defendants claim that the parties'

15  goods and services are not proximate or related. Memo at 21-22. In order to make that claim, Defendants rely on a

16  mistaken understanding of Lite Breeze's business. Defendants attempt to narrow Lite Breeze's use of its mark to

17  "$3 customer-printed athletic clothing," which is a wholesale, not a retail price. Garner Dec. ¶ 6.

18  Lite Breeze uses its mark not only on athletic clothing, but also on t-shirts that can be deemed "fan

19  appreciation merchandise" for the San Diego Symphony, the Temecula Jazz Festival and countless other events

20  involving music and sports. Garner Dec. ¶ 9. Further, Lite Breeze has owned and operated a concert venue, putting

21  its mark on the venue itself and in connection with the advertising for musical concerts and on the concert tickets.

22  Garner Dec. ¶ 7. Moreover, Lite Breeze's mark is used on flyers and posters for music and sporting events

23  throughout Southern California. Garner Dec. ¶ 3. In short, it is not a stretch to assert that the consuming public

24  believes that products sold at concerts and sporting events all originate from a single source.

25

On these facts, Lite Breeze's claims fit comfortably within the framework created by the Ninth Circuit in Dreamwerks. There, the well-known DreamWorks movie studio (the junior user) contended that its products could not possibly be related to Dreamwerks' sponsorship of Star Trek conventions (the senior user). The court rejected this argument in language that provides persuasive support for Lite Breeze's position:

> Twenty years ago DreamWorks may have had an argument that making movies and promoting sci-fi merchandise are different businesses promoting different products. But movies and sci-fi merchandise are now as complementary as baseball and hot dogs. . . . The district court emphasized that Dreamwerks has carved out a narrow niche in the entertainment marketplace, while DreamWorks controls a much broader segment. . . . But the relatedness of each company's prime directive isn't relevant. Rather, we must focus on Dreamwerks' customers and ask whether they are likely to associate the conventions with DreamWorks the studio. Entertainment studios control all sorts of related industries: publishing, clothing, amusement parks, computer games and an endless list of toys and kids' products. In this environment it's easy for customers to suspect DreamWorks of sponsoring conventions at which movie merchandise is sold.

Dreamwerks, 142 F.3d at 1131. The same is true here, music, sports and t-shirts are "as complementary as baseball and hotdogs." Id.

As demonstrated above, all three of the pivotal factors relevant to reverse confusion favor Lite Breeze. Accordingly, Lite Breeze has made a case for the likelihood of confusion for trademark infringement under the reverse confusion theory. While the "other five Sleekcraft factors don't provide much insight" in a reverse confusion case, a review of the remaining favors either favor Lite Breeze or should be given no weight because none of the parties fit comfortably within the factor. Dreamwerks, 142 F.3d at 1130 n.6.

### 4.   There Is Evidence Of Actual Consumer Confusion

Although "evidence of actual confusion can be difficult to obtain, its absence is "generally unnoteworthy" and is given little probative weight. Brookfield Comm., Inc. v. West Coast Ent. Corp., 174 F.3d 1036, 1050 (9th Cir. 1999). Contrary to Defendants' assertion that there is no evidence of actual confusion, Lite Breeze does have such evidence. The first example of actual consumer confusion comes from Robert Ruane, an independent contractor working for Lite Breeze to promote the "In the Zone" brand. While working the "In the Zone" booth at special events in the fall of 2003, Mr. Ruane noticed an unusual amount of children and teenagers coming to the "In the Zone" booth asking for information about Britney Spears. Subsequently he learned that Ms. Spears had released a

1    record album titled "In the Zone." Whenever Mr. Ruane was asked about the Ms. Spears, he told people that there

2    was absolutely no connection between Lite Breeze's "In the Zone" and Ms. Spears. Ruane Dec. ¶ 3.[28]

3            As Defendants' marketing efforts intensified, the barrage of questions about Ms. Spears' connection to "In

4    the Zone" increased. Mr. Ruane was routinely asked whether he was selling Britney Spears merchandise.

5    Additionally, parents expressed their concern to him about Ms. Spears' overt sexuality. By January 2004, Mr.

6    Ruane found it made better business sense not to display the "In the Zone" banners outside of the event booth

7    because he was spending too little time working and too much time explaining to the public that Lite Breeze's "In

8    the Zone" has nothing to do with Ms. Spears. Accordingly, Mr. Ruane stopped displaying the "In the Zone" banners

9    all together. Ruane Dec. ¶ 4.[29]

10            This is exactly the type of evidence used in a reverse confusion case. The first circuit court to recognize the

11    cause of action for reverse confusion was <u>Big O Tire Dealers, Inc.</u> v. <u>Goodyear Tire & Rubber Co.</u>, 561 F.2d 1365

12    (10th Cir. 1977). There, Big O Tire was the senior user of the mark "BIGFOOT" for use on tires. Subsequently,

13    Goodyear (the junior user) spent six million dollars on an advertising campaign to promote its new product

14    "BIGFOOT" radial tires. The court gave weight to Big O Tire's evidence of actual confusion consisting of evidence

15    that people who had seen Goodyear's advertising for BIGFOOT radical tires went to Big O Tire seeking to purchase

16    Goodyear tires. Employees of Big O Tire had to explain to skeptical customers that they sold only BIGFOOT bias

17    belted tires, not Goodyear's BIGFOOT radial tires. <u>Big O Tires</u>, 561 F.2d at 1372.[30] Here, Lite Breeze has

18    presented the same type of evidence that carried the day for Big O Tires in its reverse confusion case.

19

20

21

---

22    [28] References herein to "Ruane Dec." are to the Declaration of Robert Ruane In Opposition to Defendants' Motion
for Summary Judgment, submitted concurrently herewith.

23

24    [29] At the time Mr. Ruane was receiving these comments, he did not know that there would be an infringement suit
against the Defendants and did not record the names of the people making the comments to him. Now, over year
later, Mr. Ruane does not recall the specific people who made comments to him. Ruane Dec. ¶ 5.

25    [30] The Ninth Circuit endorsed the Big O reverse confusion theory in <u>Fuddruckers, Inc.</u> 826 F.2d 837 (9th 1987) and
<u>Dreamwerks</u>, 142 F.3d 1127 (9th Cir. 1998).

1    A second example of actual confusion comes from a 14-year boy named Aston Clarke, who attended a San

2    Diego junior high school in 2003-24. In March of last year, an article was published in the San Diego Union Tribune

3    about this lawsuit. During class, his teacher led a discussion about the lawsuit. Clarke Dec. ¶¶ 1, 2 .[31]

4    Everyone in Aston's class knew about Britney Spears and her new album titled "In the Zone." Some

5    people in the class had never heard of Lite Breeze or the products it makes with the "In the Zone" brand. When the

6    teacher said that Lite Breeze had used the words "In the Zone" before Britney Spears had used the words "In the

7    Zone," most kids in the class did not believe him. About fifty percent (50%) of the kids in the class believed that

8    Britney Spears owned the words "In the Zone" and that Lite Breeze was using the words "In the Zone" in order to

9    make people believe that it was associated with Britney Spears. Clarke Dec. ¶¶ 3, 4. Aston and his classmates are

10   in the same demographic group for both Defendants' and Lite Breeze's products. Garner Dec. ¶ 4 and Walker Dec.

11   Ex. O.

12   In short, although the absence of evidence of actual confusion is "generally unnoteworthy" and is given

13   little probative weight, Lite Breeze has evidence that specifically demonstrates actual confusion.

14
         5.   The Parties Use Some Of The Same Marketing Channels
15
16   Again, for the sake of this motion, Defendants minimize the similarities of their marketing channels.

17   Defendants concentrate only on the sale of albums in record stores and t-shirts at concerts. Memo at 23. What

18   Defendants ignore is the World-Wide Web. Lite Breeze sells its promotional products on-line, just as Defendants'

19   products are found on-line. Garner Dec. ¶ 3. Notably, a consumer could purchase Defendant Spears' concert

20   tickets, Defendants' "fan appreciation t-shirt," Defendant Zomba's "In the Zone" poster, and the "In the Zone"

21   album and/or DVD on-line. Walker Dec. Ex. R. In fact, Lite Breeze's attorneys purchased Defendant Signature's t-

22   shirt and Defendant Zomba's poster on e-bay. Garner Dec. ¶ 13.

23   The Ninth Circuit has stated that "the Web, as a marketing channel, is particularly susceptible to a

24   likelihood of confusion since, as it did in this case, it allows competing marks to be encountered at the same time, on

25

[31] References herein to "Clarke Dec." are to the Declaration of Aston Clarke in Opposition to Defendants' Motion
for Summary Judgment, submitted concurrently herewith.

the same screen." GoTo.com, Inc. v. The Walt Disney Co., 202 F.3d 1199, 1297 (9th Cir. 2000). Similarly, in Brookfield, the Ninth Circuit stated that the use of the web is a factor "that courts have consistently recognized as exacerbating the likelihood of confusion." Brookfield, 174 F.3d at 1057 (citations omitted). Thus, the fact that Defendants and Lite Breeze market their goods on the web, weighs heavily for the likelihood of confusion.

Further, Defendants' argument that the consumer will not be confused as to the source of the products based on the price of the t-shirts is simply untrue. Defendants assert that Lite Breeze's "$3 custom t-shirts" do not complete with Defendants' t-shirt because Defendants' t-shirt "costs more than double plaintiff's t-shirts." Memo at 23. Defendants are confused – the $3 t-shirt price is a wholesale price – the actual price paid by the consumer is four to seven times the wholesale price of the t-shirt. Garner Dec. ¶ 6. In sum, Defendants' t-shirt price is in the same ballpark as Lite Breeze's consumer retail price for an "In The Zone" t-shirt, again leading to customer confusion.

### 6.   The Parties Offer The Same Types Of Goods and Services

Defendants fail to recognize the extent and variety of Lite Breeze's business and its use of its mark throughout its various business ventures. Similarly, Defendants fail to grasp the reverse confusion theory. Here, Lite Breeze is not concerned that the public will believe that Lite Breeze issued the album or t-shirt. To the contrary, Lite Breeze is concerned that the public will believe that Lite Breeze is associated with Ms. Spears and that Lite Breeze's mark will be forever linked to Ms. Spears and the raunchy sex-driven image that she has promoted on her tour and the songs on the album.

As to the t-shirt, Lite Breeze, like Defendants Signatures and Britney Brands are in the same business. Obviously, Defendants' business is much larger than Lite Breeze's business and generates substantially more revenue, but both are in the merchandising and promotion industry. Similarly, Lite Breeze like Defendants Clear Channel and Britney Tours arranges for the promotion of concerts. Lite Breeze, like Defendant Clear Channel, has owned a concert venue. Walker Dec. Ex. QQ. Even after the sale of the venue, Lite Breeze continued to sponsor concerts and provide promotional services to its customers in the sporting and music worlds. Garner Dec. ¶ 9.

In short, because Lite Breeze and Defendants are engaged in the same types of businesses, it will be likely that consumers will encounter confusion in the marketplace and will believe that Lite Breeze is somehow associated with Ms. Spears and the other Defendants that support her multi-million dollar career.[32]

### 7.   Lack Of Knowledge Of Plaintiff's Mark Does Not Preclude Infringement

Just because Defendants claim that they were unaware of Lite Breeze's mark does not preclude trademark infringement. "Absence of malice is no defense to trademark infringement." Dreamwerks, 142 F.3d at 1132 n.12. Accordingly, little or no weight should be given to Defendants' assertion that it did not intend to infringe Lite Breeze's mark because it adds nothing to the ultimate question of whether consumers will be confused.[33]

### 8.   Consumers Will Believe That Ms. Spears Is In The Clothing Business

Defendants state that there is no likelihood of expansion because they are not likely to start doing business in "plaintiff's narrow niche." Memo at 24. However, what Defendants say about their likelihood of expansion is not the test. "In determining possible expansion of a product line, it is the ordinary customer's perception that counts, whether that perception comports with the reality of the [defendant's] actual plans or not." McCarthy On Trademarks at § 24:19.

Defendants Spears, Britney Brands and Signatures already produce many clothing items and have already used "in the zone" on clothing. In addition to the press reports that Ms. Spears has ventured into the fashion industry and appears at sporting events, it would seem logical for the average consumer to believe that Lite Breeze's clothing and promotion products are a part of her line of clothing. Walker Dec. Ex. T.

### B.   Defendants' Use Of The Mark Does Not Constitute Fair Use

The classic affirmative defense of fair use exists when "a defendant has used the plaintiff's mark *only* to describe his own product, *and not at all to describe the plaintiff's product.*" Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792, 810 (9th Cir. 2003). Defendants claim that they did not use "BRITNEY SPEARS IN THE

---

[32] Although, Lite Breeze did produce a compact disc entitled "In the Zone," (Def. Facts ¶¶ 27-28), Lite Breeze does not contend that it is in the recording business. However Lite Breeze does not discount the possibility of expanding into that business as its representation of musicians increases. Garner Dec. ¶ 15.

[33] At this point in the litigation, Lite Breeze does not accept Defendants' statements regarding allegations of intentional infringement and does not concede the point that Defendants' infringement was innocent.

1  ZONE 2004 TOUR" or the "In The Zone" t-shirt "as a trademark." Memo at 17.  Yet, in March 2003, Defendant

2  Spears filed two trademark applications with the PTO for: 1) "BRITNEY SPEARS THE ONYX HOTEL TOUR

3  2004," and 2) "TOXIC"[34] for use "clothing, namely jackets, pants, t-shirts" among other things.  Walker Dec. Ex. U.

4  Defendants' double standard is obvious and the Court should be swayed more by Defendants' actions than by the

5  representations made to avoid trademark infringement liability.[35]

6  **C.   The First Amendment Does Not Preclude Liability**

7  Lite Breeze acknowledges that when trademarks are used by artists as a title to a work, that there is a

8  competing interest between the Lanham Act and the First Amendment.  Mattel, Inc. v. MCA Records, Inc., 296 F.3d

9  894, 900 (9th Cir. 2002).  In Rogers v. Grimaldi, 875 F.2d 994, 997 (2d Cir. 1989), the court stated:

10      Movies, plays, books and songs are all indisputably works of artistic expression and deserve
        protection.  Nonetheless, they are also sold in the commercial marketplace like other more
11      utilitarian products, marking the danger of consumer deception a legitimate concern that warrants
        some government regulation.  *Poetic license is not without limits.*  The purchaser of a book, like
12      the purchaser of a can of peas, has a right not to be misled as to the source of the product.

13  To achieve the balance between the Lanham Act and the First Amendment, the court in Rogers put forth

14  the following test which was adopted by the Ninth Circuit: "literary titles do not violate the Lanham Act 'unless the

15  title has no artistic relevance to the underlying work whatsoever, or if it has some artistic relevance, unless the title

16  explicitly misleads as to the source or content of the work.'"  Mattel, 296 F.3d at 902 (citing Rogers, 875 F.2d at

17  999).

18

19  _____

20  [34] "Toxic" is the sixth song on the In The Zone album and was the number one selling t-shirt on the concert tour.
    Def. Ex. 25 and Walker Dec. Ex. O.  Similarly, Defendants Signatures and Britney Brands produced an extensive
21  line of "BRITNEY SPEARS THE ONYX HOTEL TOUR 2004" clothing which was available at the concerts and is
    for sale at "Britney Spears Official On-line Store" at www.britneyspears.com, Defendant Spear's official website.
22  Walker Dec. Ex. R.

23  [35] On December 22, 2004, Defendants filed their "Supplemental Memorandum of Points and Authorities re
    Intervening Supreme Court Decision" to bring a recent Supreme Court decision to the court's attention.  The
24  decision, KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., __ S.Ct. __ 2004 WL 2804921 (Dec. 8, 2004)
    (attached to Def. Supp. Memo), does nothing more than relegate the burden of proof of likelihood of confusion to
    the plaintiff.  Lite Breeze's is asserting its use of the mark in connection with musical performances constitutes a
25  common law use.  Accordingly, it is Lite Breeze's burden to show that there is a likelihood of confusion between its
    use of the phrase "in the zone" and Defendants' use of the phrase.  Lite Breeze has met its burden.

1.     Artistic Relevance Is A Question Of Fact

Simply "crying 'artist' does not confer carte blanche authority to appropriate a [mark]." Parks v. LaFace Records, 329 F.3d 437, 447 (6th Cir. 2003). In Parks the Sixth Circuit held that a viable cause of action exists under the Lanham Act even if the alleging infringing product is not entitled to traditional trademark protection. There the court reversed the district court's grant of summary judgment holding that the song title and the artistic contents of the song are not "obvious" as a matter of law and must be determined by the trier of fact. Id. at 453-54. Id. at 454.

In Parks, Rosa Parks, filed an action against LaFace Records for producing and promoting a song by OutKast entitled "Rosa Parks."[36] The lyrics of the song contained the phrase "move to the back of the bus" which the defendants claimed had a symbolic connection to Ms. Parks. Id. at 452.[37] The court stated that the "critical issue in this case is a determination of the artistic relevance of the title, Rosa Parks, to the content of the song, the lyrics obviously must be considered in their entirety." Id. at 442. After reviewing the lyrics, the court stated "[w]e believe that reasonable people could find that the use of Rosa Parks' name as the title to this song was not justified . . . To the contrary, reasonable people could find that the name was appropriated solely because of the vastly increased marketing power . . . ." Id. at 454. A review of Defendants' use of the mark leads to the same conclusion.

2.     Defendants' Use Of The Phrase "In The Zone" Has No Artistic Relevance

Here, Defendants assert that "as a matter of law the phrase 'in the zone' is relevant to the Britney Spears Album . . . ." Memo at 14. Plaintiff disagrees and asserts that whether the Defendants' use of Plaintiff's mark in connection with its album cover, concert tour and related merchandising constitutes "artistic relevance" is a question that must be determined by the trier of fact. To support their argument, Defendants rely on two cases involving Mattel's Barbie Doll. Memo at 11-13 (citing Mattel, Inc. v. MCA, 296 F.3d 894 (9th Cir. 2002) and Mattel, Inc. v. Walking Mountain Prod., 353 F.3d 792 (9th Cir. 2003)). Both of these cases involve parody – which deserves more first amendment protection than other forms of speech and is an element of the affirmative defense of fair use. MCA, 296 F.3d at 901 and Walking Mountain Prod., 353 F.3d at 800.

---

[36] Ms. Parks had also approved a collection of gossip recordings by various artists entitled "Verifty Records Presents: a Tribute to Mrs. Rosa Parks," released in 1995, three years before the defendants' release of the infringing song. Id. at 442.

[37] The song contained a Parental Advisory warning because the "lyrics contained profanity and a great deal of 'explicit' language." Id. at 453.

a)   Use Of "In The Zone" In The Lyrics To "Me Against The Music"

The phrase "in the zone" appears only four times in the lyrics to the song "Me Against The Music." [38]  Had Ms. Spears limited her use of the phrase "in the zone" to the lyrics of the song "Me Against the Music" or even if she had titled the song "in the zone" rather than titling the entire album "In The Zone," there would have been no lawsuit. Garner Dec. ¶ 14.  Because there is no song titled "In The Zone," we must look to the entire content of the album to determine whether there is any artistic relevance to the use of the title and the album as a whole. <u>Parks</u>, 329 F.3d 442.

b)   Use Of In The Zone As Album Title Has No Artistic Relevance

The album "In The Zone" contains thirteen songs, none of which are titled "in the zone."  Def. Ex. 25. Defendant Spears has stated that she used the phrase "In the Zone" to "describe how I feel when I perform" because "[w]hen I am on stage singing and dancing I get into a special frame of mind where I feel that it is just me and the music, everyone else disappears."  Spears Dec. ¶ 7.  In a November 2003, the same month that she released "In The Zone," Ms. Spears stated in an interview with VH1, that the songs entitled "Everytime" and "Touch of My Hand" "really laid the foundation for the rest of the album."  Walker Dec. Ex. V.  Neither song relates to dancing or "in the zone."  The common dictionary definition of "foundation" is the "basis on which a thing stands, is founded, or is supported."  Walker Dec. Ex. W.  If in fact, the "foundation" of the album is based upon a song about masturbation and a song about the end of a relationship, why did Defendant Spears' title her album "In the Zone" when neither of the foundational songs refer to her definition of "in the zone," i.e. dancing?  Lite Breeze posits the answer is clear – she simply used the mark "because of the vastly increased marketing power . . . ."  <u>Parks</u>, 329 at 454.

A review of other songs on the album also evidences a lack of artistic relevance to Defendants' use of Lite Breeze's mark.  The album includes an "ode to masturbation" ("Touch of My Hand"), a song about Ms. Spears' "sex drive" and "shopping sprees" ("Outrageous"), a song about a hangover ("Early Mornin'"), a song about "a girl who goes out to get picked up" ("Brave New Girl,"), and songs about "Spears succum[ing] to sexy guys ("The Hook Up," "Breathe on Me" and "Boom Boom.").  <u>See</u> Walker Dec. Ex. X and Ex. Y (contains the lyrics to the songs).  In short, "<i>In The Zone</i> offers strip-club, 1-900 sex, accommodating and hollow."  Walker Dec. Ex. X.  This is certainly

---

[38] The words are: "I wanna get in the zone, I wanna get in the zone."  Spears Dec. ¶ 6 and Ex. 28.

not the image that Lite Breeze wants forever associated with is trademark and it has nothing to do with being "in the zone."

Reviewers of the "In The Zone" album have recognized the lack of relevance between the album title and the content of the album. One reviewer concluded that "[a]lmost every song on the cd deals with sex and in a few songs she [Ms. Spears] tries to imply it is about dancing but after reading the lyrics it is obvious what the underlying meanings are." Walker Dec. Ex. FF. Another reviewer came to the same conclusion – "The line between dancing and intercourse is blurred . . . ." Walker Dec. Ex. GG. It appears that at least some members of the public fail to see the artist relevance between the title of the album and its contents.

Further evidence of the lack of artistic relevance between the content of the album and use of Lite Breeze's mark is Defendant Spears' willingness to change the name of the album from her original title "Get In The Zone" to "In the Zone." Spears Dec. ¶ 8. This was done at the drop of hat despite the actual lyrics of the song include the phrase "get in the zone," and not simply "in the zone." Spears Dec. ¶ 6. In short, Defendants were willing to change the name of the album to avoid possible litigation – that does not represent a strong held belief that the title of the album held any artistic relevance.

### c) Use Of In The Zone As Concert Tour Title Has No Artistic Relevance

Just as the album itself contains no artistic relevance to the use of Lite Breeze's mark, the initial concert tour name, "Britney Spears In The Zone Tour 2004" also lacks artistic relevance justifying Defendants' use of the mark. According to Defendant Spears' she chose "the title 'Onyx Hotel Tour' for the concert tour that began in March 2004" and she did not "personally choose" the original name of the concert tour, "In the Zone Tour 2004." Spears Dec. ¶ 10. Defendant Spears has explained that the Onyx Hotel is "a vibrant, whimsical place where wondrous dreams are realized." Walker Dec. Ex. Q. That explanation has nothing in common with either Defendant Spears' definition of "in the zone" or Lite Breeze's definition of "in the zone." See supra at 14.

In short, Defendant Spears' own words and the content of concert tour evidence the fact that there is no artistic relevance of the original tour name, "In the Zone Tour 2004," and the actual concert performance. There could be well over 187,493 tickets in the marketplace that refer to the tour as the "In The Zone Tour 2004" and there is no artistic relevance between that tour name and the contents of the actual concert. Yet there is permanent connection between Defendant Spears and "in the zone."

d)   Use Of In The Zone On T-Shirt Has No Artistic Relevance

Defendants state that their use of "in the zone" on the t-shirt simply "commemorates the Britney Spears Album." Memo at 18.  Because Lite Breeze has shown above that the use of "in the zone" has no artistic relevance, its use on the t-shirt is also void of artistic relevance.

At the very least, "the artistic relationship between the title and the content of the song is certainly not obvious and is 'open to reasonable debate'" and, therefore, is a matter for the trier of fact.  Parks, 329 F.3d at 458. See also Rogers, 875 F.2d at 457-58 ("There is a genuine issue of fact, therefore, whether the use of the Plaintiff's name and likeness on the cover of the musical CD/cassette is clearly related to the content of the film 'Panther' and serves as an advertisement for the film, or whether Defendants' use of the Plaintiff's name and likelihood on the cover of the CD/cassette is disguised advertisement for the sale of the CD/cassette" (citing Seale v. Gramercy Pictures, 949 F. Supp. 331 (E.D. Pa. 1996)).  The same is true here, the question of artistic relevance is a matter of fact and should be determined by the trier of fact.

**IV. CONCLUSION**

For all of the above stated reasons, Plaintiff Lite Breeze respectively requests that Defendants' Motion for Summary Judgment is denied in whole.

Dated: February 3, 2005

_Kathleen M. Walker_
Kathleen M. Walker
Attorney for Plaintiff, Lite Breeze