USDC SCAN INDEX SHEET

















CAG   3/21/05   11:22

3:04-CV-00326   LITE BREEZE INC V. SPEARS

*78*

*O.*

FILED

'05 MAR 21 AM 8: 19

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

:BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITE BREEZE, INC., a California Corporation,<br><br>                              Plaintiff,<br><br>     vs.<br><br>BRITNEY SPEARS, an individual, et al.,<br><br>                              Defendants. | CASE NO. 04cv0326 DMS (JFS)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 42] |

Plaintiff Lite Breeze, Inc. ("Plaintiff") brings this civil action pursuant to 28 U.S.C. § 1338 against Defendants Britney Spears ("Spears"), Clear Channel Entertainment Television Holdings, Inc. ("Clear Channel"), Signatures Network, Inc. ("Signatures"), Zomba Recordings Corp. dba Jive Records ("Zomba"), Britney Brands, Inc. ("Britney Brands") and Britney Touring, Inc. ("Britney Touring").   Plaintiff alleges four counts in its Complaint: (1) Trademark infringement, (2) false designation of origin, (3) common law unfair competition and trademark infringement, and (4) unfair trade practices.  Defendants have filed a motion for summary judgment, or in alternative, for partial summary judgment.  After careful consideration, the Court GRANTS Defendants' motion for summary judgment.

/ / /

/ / /

/ / /

- 1 -

# I.

## PROCEDURAL BACKGROUND

On February 17, 2004, Plaintiff filed its original complaint in this case. After substituting new counsel, Plaintiff filed a First Amended Complaint on May 14, 2004. After participating in an Early Neutral Evaluation with Magistrate Judge James F. Stiven on July 23, 2004, Plaintiff filed a motion for leave to file a Second Amended Complaint on August 12, 2004. Judge Stiven granted that motion on September 14, 2004, and Plaintiff filed its Second Amended Complaint on September 30, 2004. On November 18, 2004, the Court issued an Order allowing Plaintiff to file a Third Amended Complaint, pursuant to the parties' stipulation. Plaintiff filed its Third Amended Complaint on November 18, 2004.

On November 23, 2004, Defendants filed their present motion for summary judgment or, in the alternative, partial summary judgment. On December 22, 2004, Defendants filed a supplemental memorandum of points and authorities in support of their motion in light of a new decision from the United States Supreme Court. Plaintiff filed its opposition to Defendants' motion on February 2, 2005, and Defendants filed their reply brief on February 11, 2005. The motion came on for hearing on March 11, 2005. Kathleen Walker, Esq. appeared on behalf of Plaintiff, and Peter Anderson, Esq. appeared on behalf of Defendants. Bruce Isaacs, Esq. also appeared on behalf of Defendant Zomba.

# II.

## FACTUAL BACKGROUND

### A.    Plaintiff, Its Business and Its Trademarks

Plaintiff is a California corporation that was formed in 1989. (Corrected Separate Statement of Material Facts in Supp. of Defs.' Mot. for Summ. J. or Partial Summ. J. at 5.) Plaintiff is, and always has been, solely owned by Rodd Garner, who is also Plaintiff's sole officer. (*Id.*) Since 1992, Plaintiff has used the phrase "in the zone" in connection with its business of supplying custom-printed athletic clothing and sporting team uniforms to athletic team coaches and to hosts of special events, such as marathons, 5K and cycle races and the Old Mission Beach Athletic Club's Over the Line beach softball tournaments. (*Id.*) Plaintiff starts

1   with blank clothing and adds the name of the purchaser's team or special event or other

2   language or images requested by the purchaser. (*Id.* at 6.) Plaintiff then provides its customers

3   with the option of either (1) buying t-shirts that do not also bear the phrase "in the zone" or (2)

4   buying t-shirts that include phrases such as "In the Zone" and "In the Zone Game Day

5   Apparel" or a distinctive "In the Zone" logo to promote Plaintiff's clothing. (*Id.*)  If the

6   customer chooses the latter option, Plaintiff discounts the price of its clothing. (*Id.*)  Plaintiff

7   also offers its customers a discount in exchange for permission to hang banners promoting its

8   clothing. (*Id.* at 8.)

9        In 1993, Plaintiff applied for a federal registration of "in the zone" for "sportswear,

10   namely shorts, t-shirts, tanktops, sweatshirts and sweatpants." (*Id.* at 6.) That application was

11   granted on October 2, 2001, as number 2,493,712. (*Id.*)  In 1997, Plaintiff obtained by

12   assignment another's pending federal registration of "in the zone" for "clothing, specifically

13   t-shirts and sweatshirts."   That application was granted on August 21, 2001, as number

14   2,478,730. (*Id.*)

15       **B.**   **The "In the Zone" Album**

16        Defendant Spears is a professional signer, songwriter, recording artist and actress. (*Id.*

17   at 11.)  In November 2003, Defendant Zomba released Defendant Spears' "In the Zone"

18   album. (*Id.* at 12.) Defendant Spears understood the phrase "in the zone" to describe a special

19   state in which a person is intently focused and performing at his or her highest level. (*Id.*)

20   That phrase describes Defendant Spears' special frame of mind when she is on stage singing

21   and dancing and feels that only she and the music exist and everyone else has disappeared.

22   (*Id.*)

23        Defendant Spears initially decided to use the phrase "Get In the Zone" as the album title

24   to describe that special frame of mind when she is performing. (*Id.* at 12-13.) However, when

25   a press release announced the release of the album with that title, Autozone, Inc. objected

26   because it used that phrase for its auto parts stores. (*Id.* at 13.) Defendant Zomba denied that

27   Autozone had a basis to object to the "Get In the Zone" title, but since Autozone did not object

28   / / /

1  to the use of the phrase "In the Zone," and the use of "In the Zone" was sufficient for her

2  artistic purposes, Defendant Spears agreed to use "In the Zone" as the album title. (*Id.*)

3      The first single released from the "In the Zone" album is entitled "Me Against the

4  Music." (*Id.* at 12.) Defendant Spears co-wrote the song, which describes an intense dancer's

5  transcendent state and includes the lyrics:

6      I'm the only one dancin' up in this place
        Tonight I'm here
7      Feeling the beat of the drum, gotta get with that bass
        I'm up against the speaker, tryin' to take on the music
8      It's like a competition, me against the beat
        I wanna get in the zone, I wanna get in the zone . . .
9      Let me see what you got, don't hesitate
        I'm up against the speaker, tryin' to take on the music
10     It's like a competition, me against the beat
        I wanna get in the zone, I wanna get in the zone.

11

12  (*Id.* at 13.)

13      **C.    The "In the Zone" Concert Tour**

14      On December 1, 2003, Defendant Clear Channel issued a press release announcing a

15  concert tour starting March 2, 2004, and featuring Defendant Spears and her performance of

16  songs from the "In the Zone" album. (*Id.* at 14.)  The press release referred to the tour by

17  reference to the album title, namely as the Britney Spears In the Zone Tour 2004. (*Id.* at 14-

18  15.) From December 10 through December 14, 2003, radio and television commercials were

19  broadcast to promote ticket sales for the tour. (*Id.* at 15.)  These commercials referred to

20  Defendant Spears and referred to the tour as the "In the Zone" Tour. (*Id.*) Tickets for the tour

21  went on sale on December 13, 2003, and identified the concert as Britney Spears In the Zone

22  Tour 2004. (*Id.*)

23      After Defendant Spears chose the title "The Onyx Hotel Tour" as the title of the concert

24  tour, that title was officially announced on January 7, 2004. (*Id.*)  Radio and television

25  commercials broadcast after that date to promote ticket sales referred to the tour as the Onyx

26  Hotel Tour. (*Id.* at 16.)  Some, but not all, of the concert tickets also reflected the change in

27  the tour title from the In the Zone Tour 2004 to the Onyx Hotel Tour 2004. (*Id.*)

28  / / /

- 4 -

**D.    The "In the Zone" T-Shirt**

Defendant Signatures designs and markets music industry "fan appreciation merchandise." (*Id.* at 17.)  In late 2003, Defendant Signatures created at least seventeen different designs for a fan appreciation t-shirt with artwork based on Defendant Spears' "In the Zone" album cover. (*Id.* at 18.)  The final design for the t-shirt consists of the photograph of Defendant Spears featured on the album cover, uncropped so that her neck and shoulders can be seen, with starburst patterns over which are superimposed the words "Britney" in large typeface, and below it, in smaller typeface "In the Zone." (*Id.*)  Defendant Signatures sold 491 t-shirts with this design. (*Id.* at 18-19.)

## III.

## DISCUSSION

Defendants move for summary judgment on Plaintiff's Third Amended Complaint. They raise two primary arguments.  First, they assert Plaintiff's claims fail under the "artistic relevance" test.  Second, they argue they are entitled to judgment pursuant to the fair use doctrine.

**A.    Standard of Review**

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The moving party must identify the pleadings, depositions, affidavits, or other evidence that it "believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The burden then shifts to the opposing party to show that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255 (1986). However, to avoid summary judgment, the opposing party cannot rest solely on conclusory allegations. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, it must designate specific facts showing there is a genuine issue for trial. *Id.* More than a "metaphysical doubt" is required to establish a genuine issue of material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### B.    Legal Background

As mentioned above, the primary issue in this case is whether Defendants' use of "In the Zone" as the title of an album, the title of a concert tour and on Defendants' t-shirts infringes Plaintiff's "In the Zone" trademark. "A trademark is a word, phrase or symbol that is used to identify a manufacturer or sponsor of a good or the provider of a service." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002). Federal registration of a trademark is "the owner's way of preventing others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner." *Id. See also Mattel Inc. v. Walking Mountain Productions*, 353 F.3d 792, 806 (9th Cir. 2003) ("Trademark law aims to protect trademark owners from a false perception that they are associated with or endorse a product.") The core purpose of a trademark is "avoiding confusion in the marketplace[.]" *MCA*, 296 F.3d at 900.

In the Ninth Circuit, the traditional test for trademark infringement is the "likelihood of confusion" test.[1] This test requires consideration of eight factors: "1) strength of the mark; 2) proximity or relatedness of the goods; 3) similarity of the marks; 4) evidence of actual confusion; 5) marketing channels; 6) type of goods and degree of purchaser care; 7) intent in selecting mark; and 8) likelihood of expansion." *Walter*, 210 F.3d at 1111 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-39 (9th Cir. 1979)). Consideration of all these factors, however, may not be appropriate or necessary in all cases of alleged trademark infringement.

---

[1] Plaintiff's other claims also turn on the likelihood of confusion test. *See Walter v. Mattel, Inc.*, 210 F.3d 1108, 1110 n.1 (9th Cir. 2000) (stating false designation of origin and unfair competition claims under California law were "coextensive . . . because all of the claims turn on the sufficiency of proof of likelihood of confusion."); *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 n.2 (9th Cir. 1998) (stating summary judgment on trademark infringement claims under federal and state law "turns in either case on the likelihood of confusion[.]")

1   For instance, in this case Defendants assert they are entitled to judgment under the "artistic

2   relevance" test and the fair use doctrine, neither of which, according to Defendants, requires

3   consideration of the likelihood of confusion factors. Plaintiff disputes these arguments, and

4   urges the Court to consider all of the factors under a traditional infringement analysis, or to

5   consider certain factors under a reverse infringement theory.

6       **C.    "Artistic Relevance" Test**

7           The "artistic relevance" test was first set out by the Second Circuit in *Rogers v.*

8   *Grimaldi*, 875 F.2d 994 (2d Cir. 1989). That case concerned an Italian film created and

9   directed by Federico Fellini entitled "Ginger and Fred." *Id.* at 996. "The film tells the story

10  of two fictional Italian cabaret performers, Pippo and Amelia, who, in their heyday, imitated

11  Rogers and Astaire and became known in Italy as 'Ginger and Fred.' The film focuses on a

12  televised reunion of Pippo and Amelia, many years after their retirement." *Id.* at 996-97. After

13  distribution of the film, Ginger Rogers filed suit against the film's producers and distributors

14  for violation of the Lanham Act, violation of Rogers' right of publicity and right to privacy,

15  and for defamation. On summary judgment, the district court dismissed the plaintiff's claims.

16  In dismissing the Lanham Act claim, the district court effectively created "a nearly absolute

17  privilege for movie titles, insulating them from Lanham Act claims as long as the film itself

18  is an artistic work, and the title is relevant to the film's content." *Id.* at 997.

19          The Second Circuit affirmed the district court's dismissal of the plaintiff's Lanham Act

20  claim, but applied a slightly different approach. The court recognized the First Amendment

21  concerns involved, and stated: "Movies, plays, books, and songs are all indisputably works of

22  artistic expression and deserve protection." *Id.* However, the court also recognized that these

23  art forms "are also sold in the commercial marketplace like other more utilitarian products,

24  making the danger of consumer deception a legitimate concern that warrants some government

25  regulation." *Id.* Nevertheless, the court found "the expressive element of titles requires more

26  protection than the labeling of ordinary commercial products" because:

27          Titles, like the artistic works they identify, are of a hybrid nature, combining
            artistic expression and commercial promotion. The title of a movie may be both
28          an integral element of the film-maker's expression as well as a significant means
            of marketing the film to the public. The artistic and commercial elements of

                                            - 7 -                                    04cv0326

1
2
3
4

> titles are inextricably intertwined. Film-makers and authors frequently rely on word-play, ambiguity, irony, and allusion in titling their works. Furthermore, their interest in freedom of artistic expression is shared by their audience. The subtleties of a title can enrich a reader's or a viewer's understanding of a work. Consumers of artistic works thus have a dual interest: They have an interest in not being misled and they also have an interest in enjoying the results of the author's freedom of expression.

5   *Id.* at 998.

6       In an effort to balance those interests, the court created the "artistic relevance" test,

7   which precludes liability under the Lanham Act for artistic titles "unless the title has no artistic

8   relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the

9   title explicitly misleads as to the source or the content of the work." *Id.* at 999. The court

10  stated this test "insulates from restriction titles with at least minimal artistic relevance that are

11  ambiguous or only implicitly misleading but leaves vulnerable to claims of deception titles that

12  are explicitly misleading as to source or content, or that have no artistic relevance at all." *Id.*

13  at 1000.

14      In *MCA*, the Ninth Circuit adopted the "artistic relevance" test in a case addressing

15  whether the title of the song "Barbie Girl" infringed Mattel's Barbie trademark. The court

16  rejected application of its traditional "likelihood of confusion" test to the facts of that case

17  because it failed "to account for the full weight of the public's interest in free expression." 296

18  F.3d at 900.[2] The court noted the public's interest in free expression was particularly important

19  in that case because the Barbie trademark had transcended its "identifying purpose" and

20  entered the "public discourse and become an integral part of our vocabulary." *Id.* As the court

21  explained:

22
23
24
25

> How else do you say that something's "the Rolls Royce of its class"? What else is a quick fix, but a Band-Aid? Does the average consumer know to ask for aspirin as "acetyl salicylic acid"? Trademarks often fill in gaps in our vocabulary and add a contemporary flavor to our expressions. Once imbued with such expressive value, the trademark becomes a word in our language and assumes a role outside the bounds of trademark law.

26  *Id.* (internal citation omitted).

27

28  _____

> [2] This holding refutes Plaintiff's argument that the Court must consider the likelihood of confusion factors in analyzing the artistic relevance test.

1      The court also appeared to be influenced by the defendant's use of the Barbie trademark

2  as a song title. Unlike other potential uses, the court stated: "A title is designed to catch the

3  eye and to promote the value of the underlying work.  Consumers expect a title to

4  communicate a message about the book or movie, but they do not expect it to identify the

5  publisher or producer." *Id.* at 902. Applying the "artistic relevance" test to the facts of the

6  case, the court ultimately concluded "that MCA's use of Barbie is not an infringement of

7  Mattel's trademark." *Id.*

8      In another case involving a song title, the Sixth Circuit adopted and applied the "artistic

9  relevance" test rather than the traditional "likelihood of confusion" test to the plaintiff's

10  trademark infringement claim. *See Parks v. LaFace Records*, 329 F.3d 437 (6th Cir.), *cert.*

11  *denied*, 540 U.S. 1074 (2003).  Like the Ninth Circuit, the Sixth Circuit found the "likelihood

12  of confusion" test "ignores the fact that the artistic work is *not* simply a commercial product

13  but also a means of communication." *Id.* at 449.  The court stated: "we do not find the

14  unmodified likelihood of confusion test applied to commercial products adequate to

15  differentiate between those artists who choose titles for the purpose of legitimate artistic

16  relevancy and those artists who choose misleading titles for the purpose of commercial gain."

17  *Id.*

18      Unlike the Ninth Circuit, however, the Sixth Circuit reversed the district court's grant

19  of summary judgment in favor of the alleged infringer. The Sixth Circuit refused to see its task

20  as simply "accept[ing] without question whatever purpose Defendants may now claim they had

21  in using Rosa Parks' name." *Id.* at 454.[3]  Instead, it described its task as determining "whether,

22  applying the law of *Rogers*, there is a genuine issue of material fact regarding the question of

23  whether the title is artistically relevant to the content of the song."  *Id.*  In making this

24  determination, the court considered the lyrics of the song in their entirety.  Although the phrase

25  "move to the back of the bus" was repeated throughout the song, the court found the phrase

26  / / /

27

28      [3] The song at issue in this case was entitled "Rosa Parks," and was recorded by the musical group OutKast.

1   had nothing to do with Rosa Parks when considered in the context of the lyrics as whole. *Id.*

2   Ultimately, the court determined "the artistic relationship between the title and the content of

3   the song is certainly not obvious and, indeed, is 'open to reasonable debate[.]'" *Id.* at 452.

4   Assuming, however, the jury found some artistic relevance between the title and the lyrics, the

5   court stated judgment should be entered in favor of the defendants "because the title 'is not

6   explicitly misleading as to the content of the work.'" *Id.* at 459.

7         Here, Defendants assert the artistic relevance test applies to Plaintiff's claims against

8   the album title, the concert tour and the t-shirt. Plaintiff does not dispute application of the test

9   to the facts of this case, but disputes that Defendants are entitled to judgment under this test.

10              1.    The Album Title

11        As explained above, the first prong of the artistic relevance test asks whether there is

12  any artistic relevance between the title and the underlying work. Defendants assert there is,

13  and they rely on the Declaration of Britney Spears to support that assertion. Defendant Spears

14  states she used the phrase "get in the zone" in the lyrics of her song, "Me Against the Music,"

15  "to describe that special frame of mind when I am performing." (Decl. of Britney Spears in

16  Supp. of Defs.' Mot. for Summ. J. or Partial Summ. J. ("Spears Decl.") at 3.) She also states:

17        I decided to use the phrase "Get in the Zone" in the title of the 2003 album.
          When I am on stage singing and dancing I get into a special frame of mind
18        where I feel that it is just me and the music, and everyone else disappears. The
          phrase "in the zone" describes that special frame of mind and I have used the
19        phrase to describe how I feel when I perform.

20  (*Id.*)

21        Despite this evidence, Plaintiff argues there is no artistic relevance between the album

22  title and the album contents. In support of this argument, Plaintiff relies on Defendant Spears'

23  statement that the songs "Touch of My Hand" and "Everytime" laid the foundation for the "In

24  the Zone" album. (*See* Pl.'s Mem. of Law and P. & A. in Opp'n to Defs.' Mot. for Summ. J.

25  at 23.) However, this statement was made in response to the question: "What songs are most

26  meaningful to you on *In the Zone*?" (Decl. of Kathleen M. Walker in Opp'n to Defs.' Mot. for

27  Summ. J. ("Walker Decl."), Ex. V.) This question and Defendant Spears' response thereto are

28

- 10 -

1   of little, if any, relevance to the issue of whether there is any artistic relevance between the title

2   of the album and its contents.

3       The same may be said for the critical reviews of "In the Zone." Plaintiff states these

4   reviews "have recognized the lack of relevance between the album title and the content of the

5   album." (Pl.'s Mem. of Law and P. & A. In Opp'n to Defs.' Mot. for Summ. J. at 24.)

6   However, the reviews upon which Plaintiff relies do not assess that issue; rather, they are

7   merely "suggestions for a spiritual check"

8   (http://www.wisemenpromotions.com/secular/why_do_we_do_reviews.htm (February 17,

9   2005)), and are "designed to help equip parents, youth leaders, ministers and teens with the

10  essential tools that will enable them to understand, navigate and impact the culture in which

11  they live." http://www.pluggedinonline.com/aboutUs/index.cfm (February 17, 2005).

12      The only other items of evidence to support Plaintiff's assertion of a lack of artistic

13  relevance are the absence of any songs specifically entitled "In the Zone" on the "In the Zone"

14  album, and Defendants' decision to change the album title from "Get In the Zone" to "In the

15  Zone." As with the evidence discussed above, however, neither of these facts is material to

16  the issue of whether the album title is artistically relevant to the album contents.

17      Nevertheless, Plaintiff argues the facts of this case lead to the same conclusions reached

18  in *Parks*: that artistic relevance is a question of fact, and the defendants chose to use the

19  plaintiff's name as the title of their song because of the increased marketing power associated

20  with the plaintiff's name. In *Parks*, however, the court was faced with evidence that there was

21  *no* artistic relevance between the song title and the lyrics. Specifically, the court had before

22  it defendants' admission that the lyrics of their song "are *not* about Rosa Parks." 329 F.3d at

23  452. They explained: "[t]he lyrics' sole message is that OutKast's competitors are of lesser

24  quality, and, therefore, must 'move to the back of the bus,' or in other words, 'take a back

25  seat.'" *Id.* at 452-53. In contrast to the defendants in *Parks*, Defendant Spears explains that

26  her album title, "In the Zone," was meant to describe her state of mind when she is performing.

27  Her song, "Me Against the Music," which repeats the line, "It's like a competition, me against

28  the beat[.] I wanna get in the zone, I wanna get in the zone . . ." corroborates her assertion.

- 11 -

1   Plaintiff fails to present any evidence to discredit that explanation, or to otherwise show there

2   is no relationship between the album title and its contents. Unlike *Parks*, there is no genuine

3   issue of material fact in this case that prevents the entry of summary judgment.[4]

4       Furthermore, Plaintiff fails to demonstrate its trademark has the same kind of

5   "marketing power" as the plaintiff's name in *Parks*. In *Parks*, the plaintiff had gained celebrity

6   status and "international recognition as a symbol of the civil rights movement[.]" *Id.* at 447.

7   Based on the plaintiff's celebrity status, the Sixth Circuit stated: "[t]he use of [the plaintiff's]

8   name unquestionably was a good marketing tool[.]" *Id.* at 453. Here, Plaintiff fails to present

9   any evidence that Defendant Spears selected Plaintiff's trademark ("In the Zone") to enhance

10  the sale of her album "to the consuming public" by virtue of the album's association with

11  Plaintiff or Plaintiff's trademark. *Id.* Indeed, the evidence before the Court demonstrates that

12  Plaintiff's trademark is a commonly used metaphor. It is used by numerous artists, entertainers

13  and businesses in a variety of contexts (sports, automobiles, sex, dancing, etc.) to convey the

14  same meaning Plaintiff attributes to it, *i.e.*, "a higher level of performance that is almost

15  subconscious, that happens at a moment in time when body, mind, and soul become one."

16  (Decl. of Peter Anderson in Supp. of Defs.' Mot. for Summ. J. or Partial Summ. J. at 274

17  (Deposition of Rodd Alan Garner at 32.))

18      In the absence of any relevant evidence to rebut Defendants' showing of artistic

19  relevance between the album title and its contents, and in light of the factual differences

20  between this case and *Parks*, this Court concludes there is at least some artistic relevance

21  between the "In the Zone" album title and its contents.

22      The second prong of the artistic relevance test asks whether "the title explicitly misleads

23  as to the source or the content of the work." *Rogers*, 875 F.2d at 999. Plaintiff does not

24

25      [4] Plaintiff attempts to create a factual dispute by asserting the album contents, as a whole, have more to do with sex than dancing and singing. Even assuming this were true, however, it would not

26  be material to the outcome of this case. As stated by the Supreme Court: "Sexual expression which is indecent but not obscene is protected by the First Amendment[.]" *Sable Communications of*

27  *California v. Federal Communications Commission*, 492 U.S. 115, 126 (1989). Furthermore, the phrase "In the Zone" has euphemistic application to contexts other than singing and dancing, *e.g.*,

28  sports, automobiles and sex, and therefore it may be artistically relevant to an album filled with sexual content. *See Walking Mountain*, 353 F.3d at 802, 806-07 (finding use of Barbie mark artistically relevant to photographs of Barbie "in sexually suggestive contexts.")

1   address this issue, but Defendants state they never mentioned Plaintiff, therefore the album title

2   is not explicitly misleading.  There is no dispute in this case that the album title does not

3   mention Plaintiff, nor is Plaintiff mentioned anywhere on the album cover.  Under these

4   circumstances, the Court finds Defendants' album title is not "explicitly mislead[ing] as to the

5   source or the content of the work." *Id.*

6        Having satisfied both elements of the artistic relevance test, Defendants are entitled to

7   summary judgment on Plaintiff's claim that Defendants' album title infringes upon Plaintiff's

8   trademark.

9              2.        The Concert Tour

10       The next alleged infringing use of Plaintiff's trademark is Defendants' concert tour,

11  which was initially entitled, "In the Zone Tour 2004."  As with the album title, the parties do

12  not dispute the concert tour was not explicitly misleading.  However, they do dispute whether

13  the concert tour title is artistically relevant to its content.

14       Defendants assert "In the Zone Tour 2004" is artistically relevant "because the concerts

15  featured songs from the Britney Spears In the Zone Album." (Defs.' Mem. of P. & A. in Supp.

16  of Defs.' Mot. for Summ. J. or Partial Summ. J. at 15.)  Plaintiff does not dispute this fact.

17  Instead, Plaintiff seems to argue "The Onyx Hotel Tour" is artistically irrelevant to "In the

18  Zone Tour 2004." (*See* Pl.'s Mem. of Law and P. & A. In Opp'n to Defs.' Mot. for Summ. J.

19  at 24.)  However, whether the two concert tour titles are artistically relevant to each other is

20  not the issue.  The issue is whether "In the Zone Tour 2004" is artistically relevant to the actual

21  concert performances.  As stated above, there is no dispute the concerts feature songs from the

22  "In the Zone" album.  This fact is sufficient to demonstrate artistic relevance between the

23  concert tour title and its content.  Accordingly, Defendants are entitled to summary judgment

24  on Plaintiff's claim that Defendants' concert tour title infringes upon Plaintiff's trademark.

25             3.        The T-Shirts

26       Plaintiff's final allegation of infringement concerns Defendants' use of "In the Zone"

27  on its fan t-shirts.  Again, the parties do not dispute the t-shirts are not explicitly misleading.

28  However, they do dispute the artistic relevance of the use of the phrase to the t-shirts.

1    As with the concert tour title, Defendants assert the use of the phrase "In the Zone" on

2  the fan t-shirts is artistically relevant because it refers to the "In the Zone" album.  Plaintiff

3  does not dispute this fact, but relies on the arguments discussed above to establish the lack of

4  artistic relevance.   The Court rejected those arguments above, and finds them no more

5  persuasive here.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's

6  claim that Defendants' fan t-shirts infringe upon Plaintiff's trademark.

7                                              **IV.**

8                                **CONCLUSION AND ORDER**

9    For these reasons, the Court GRANTS Defendants' Motion for Summary Judgment

10  [Doc. No. 42] based on the artistic relevance test.[5]  The Clerk of Court shall enter judgment

11  accordingly.  All currently scheduled dates are hereby vacated.

12    **IT IS SO ORDERED**.

13  DATED:_____**3-18-05**_____

14                                                DANA M. SABRAW
                                                  United States District Judge

15  cc:    Judge Stiven
          all parties

16

17

18

19

20

21

22

23

24

25

26

27

28    _____

     [5]  Because Defendants are entitled to judgment under this test, the Court does not consider
Defendants' alternative defense of fair use.

                                         - 14 -